**John C. ROEMER, III, et al.**

v.

**BOARD OF PUBLIC WORKS OF the STATE OF MARYLAND et al.**

Civ. No. 72–307–Y.

United States District Court,
D. Maryland.

Oct. 16, 1974.

Probable Jurisdiction Noted Feb. 18, 1975.
See 95 S.Ct. 1115.

Appeal Dismissed in Part April 7, 1975.
See 95 S.Ct. 1455.

Lawrence S. Greenwald, Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen., Md., George A. Nilson, Asst. Atty. Gen., Md., Baltimore, Md., for Bd. of Public Works of State of Maryland, Marvin Mandel, Governor, Louis L. Goldstein, Comptroller, and John A. Leutkemeyer, Treasurer.

Paul R. Connolly, Charles H. Wilson, Jr., Washington, D. C., for Mt. Saint Mary's College and the Associated Professors of Loyola College in the City of Baltimore, Inc.

John H. Mudd, H. Thomas Howell, William F. Gately, Baltimore, Md., for Western Maryland College.

George W. Constable, Baltimore, Md., for College of Notre Dame of Maryland, Inc.

George T. Tyler, Baltimore, Md., for Saint Joseph College of Emmitsburg, Maryland, Inc.

Before BRYAN, Senior Circuit Judge, and WATKINS and YOUNG, District Judges.

JOSEPH H. YOUNG, District Judge.

Article 77A, § 65, et seq. of the Maryland Annotated Code provides public aid in the form of non-categorical grants to eligible colleges and universities in the State. Four Maryland citizens and taxpayers[1] have challenged the constitutionality of Md.Ann.Code art. 77A, § 65, et seq. (1969 Repl.Vol.) on the grounds that the statute violates the Establishment Clause of the First Amendment[2] to the Constitution of the United States. Included among the eligible recipients are five church-affiliated institutions. The plaintiffs seek an injunction against further aid grants and a declaration that all funds received by the recipient institutions be paid over to the state with interest.[3] The defendants in the case are the Governor, Comptroller and Treasurer of the State of Maryland, all of whom constitute the Board of Public Works of the State of Maryland, and the five church-affiliated institutions which are recipients of aid under the statute.[4]

---

1. The original plaintiffs in this suit included the American Civil Liberties Union of Maryland, and Protestants and Other Americans United for Separation of Church and State. However, in an earlier unpublished opinion in this case, both of these organizational plaintiffs were dismissed for lack of standing. See American Civil Liberties Union of Maryland v. Board of Public Works of the State of Maryland, Civil No. 72–307–Y (D. Md. Dec. 13, 1972) (Young, J.). The four individual plaintiffs, all Maryland taxpayers, were permitted to proceed on the basis of Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

2. "Congress shall make no law respecting an establishment of religion * * *."
 In American Civil Liberties Union of Maryland v. Board of Public Works, supra n. 1, this Court dismissed plaintiffs' challenge to the constitutionality of this statute based on the Free Exercise Clause of the First Amendment.

3. See Findings of Fact, Appendix, n. 2.

4. The College of Notre Dame, Mount St. Mary's College, Saint Joseph College, and the Associated Professors of Loyola College in the City of Baltimore, Inc. (Loyola College) are all affiliated with the Roman

The thirteen non-church-affiliated educational institutions which receive aid are not joined as defendants.

Jurisdiction is based on 28 U.S.C. § 1331. A District Court of three judges was convened pursuant to 28 U.S.C. §§ 2281 and 2284. United States District Judge Joseph H. Young of this panel was appointed to conduct fact-finding hearings as to the character of the defendant schools and the administration of the Act. The findings of fact which resulted from these hearings constitute the sole factual basis upon which this opinion rests, and are incorporated into this opinion as an appendix.

Section 66 of the article under attack limits the aid program to private colleges and universities which are accredited by the State Department of Education. However, educational institutions which award only seminarian or theological degrees are not eligible for aid. In 1972, after the decisions in Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L.Ed.2d 745 (1971), and Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Maryland Legislature enacted section 68A which reads: "None of the moneys payable under this subtitle shall be utilized by the institutions for sectarian purposes." Ch. 534, [1972] Md.Laws 1495.

The responsibility for administration of this program is vested in the Maryland Council for Higher Education. The council is a public commission appointed by the Governor to coordinate state programs in higher education and to prepare reports and recommendations to appropriate state officials and institutions for the benefit of Maryland higher education. The Council was established prior to the creation of the state aid program in question and had developed considerable expertise as to the character and functions of the various private colleges and universities in the State, independent of its functions as administrator of this program.

The formula by which aid is allocated among the various schools has been changed on several occasions. As the statute was originally enacted, the amount of aid to be given to the schools was computed by multiplying by two hundred dollars the number of associate of arts degrees and by five hundred dollars the number of bachelor's degrees, excluding seminarian or theological degrees, conferred by the institution in the previous academic year. The funds would be paid to the school in the form of a direct grant which the school could use for any purpose. The 1973 amendments provided for an additional five hundred dollar grant for each graduate degree conferred in the previous academic year. The 1974 amendments provide a formula by which 15% of the average yearly expenditure for a student in the state college system is multiplied by the number of full-time students in each school up to a total of approximately $3,000,000 for the entire program. Each change in the statutory formula has resulted in a significant increase in public aid to the recipient institutions.

The analysis of Article 77A, §§ 65 et seq., presents this Court with a problem of great sensitivity and complexity. Throughout this country's history the separation of church and state has served the nation well as a guard against religious oppression. This principle has further served to protect the vitality and integrity of American religious institutions.[5] The existence of a

Catholic Church. Western Maryland College is affiliated with the Methodist Church. Since the initiation of these proceedings Saint Joseph College has become defunct although it is still joined as a defendant in the case.

5. Over a century ago Alexis de Tocqueville concluded that the unusual strength of religion in America was largely attributable to the separation of church and state:

Religions intimately united with the governments of the earth have been known to exercise sovereign power founded on terror and faith; but when a religion contracts an alliance of this nature, I do not hesitate to affirm that it commits the same error as a man who should sacrifice

system of private colleges and universities, including a component of church-affiliated institutions, has maintained a pluralist tradition in higher education and has resulted in substantial savings to the public treasury. The question presented is whether the Legislature in an otherwise commendable effort to assist the system of private education in Maryland has violated the First Amendment prohibition of laws "respecting an establishment of religion." This Court must conclude that the statute does not violate the Establishment Clause.

██ The Establishment Clause clearly does not prevent any form of public aid or service to any church-affiliated institution, *see, e. g.*, Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1047); Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899).[6] The Supreme Court has also explicitly rejected the notion that " * * * all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." Hunt v. McNair, *supra,* 413 U.S. at 743, 93 S.Ct. at 2874. On the other hand, aid to church-related institutions must be analyzed with the greatest care to ensure that the purposes of the religion clauses are not violated. *See* Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37

L.Ed.2d 948 (1973); Levitt v. Committee for Public Education, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

██ The Supreme Court has evolved a three part test by which the constitutionality of a statute may be determined in light of the Establishment Clause. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster 'an excessive government entanglement with religion.'" Lemon v. Kurtzman, *supra,* 403 U.S. at 612–613, 91 S.Ct. at 2111. Government entanglement must be avoided in two areas— the statute must not cause excessive administrative entanglement in its enforcement and the aid program must not cause an excessive entanglement of religion in the political process. *See* Lemon v. Kurtzman, *supra.*

The findings of fact in this case clearly indicate that the statute was enacted with a secular purpose. The program will save the taxpayers of Maryland substantial amounts of money which would otherwise have had to be spent to expand public educational institutions. The Court notes that over two-thirds of the recipient institutions have no religious affiliations.

The findings of fact also conclude that the statute has not had the primary effect of advancing or inhibiting religion. This Court's analysis indicates that this conclusion is correct.

---

his future to his present welfare; and in obtaining a power to which it has no claim, it risks that authority which is rightfully its own. * * *

In America religion is perhaps less powerful than it has been at certain periods and among certain nations; but its influence is more lasting. It restricts itself to its own resources, but of these none can deprive it; its circle is limited, but it pervades it and holds it under undisputed

control. A. de Tocqueville, Democracy in America, 321, 323 (Bradley ed. 1945).

6. As an example, the Maryland Council on Higher Education performs a valuable function for Maryland higher education generally, and thereby benefits church-affiliated colleges and universities located in Maryland. There is no suggestion, however, that the Council's operations, leaving aside the question now before this Court, are violative of the Establishment Clause.

■ A court may find that the primary effect of a program of aid will be to advance religion " . . . when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." Hunt v. McNair, *supra*, 413 U.S. at 743, 93 S.Ct. at 2874.

Both *Tilton* and *Hunt* are instructive in determining when an institution is "pervasively sectarian." The Court in *Tilton* rejected the use of a composite profile of a sectarian institution and instead focused on the actual characteristics of the four independent colleges. The Court noted that all four schools subscribed to the 1940 Statement of Principles on Academic Freedom and Tenure endorsed by the American Association of University Professors, and that an atmosphere of academic freedom prevailed on each campus. Each of the four schools admitted students and hired faculty who were not members of the affiliated church. None of the schools required attendance at religious services. Although all of the schools required students to study theology, the courses were taught according to the academic requirements of the subject matter. The five defendants in this case have been found to conform closely to the colleges approved in Tilton v. Richardson, *supra*. See Findings of Fact.[7] Thus, as a matter of fact the defendants are not so pervasively sectarian that aid would have a primary effect of advancing religion.

The aid program also cannot be said to fund a "specifically religious activity

in a secular setting." In a higher education setting this prohibition is satisfied by the existence of limitations and safeguards against sectarian use. Thus in *Tilton*, the provision held unconstitutional permitted the recipient school to use publicly-financed buildings for religious purposes after a twenty-year period. Some form of government surveillance of the use of the buildings would be necessary even after twenty years to prevent a specifically religious activity from ever occurring in the buildings. In *Hunt*, the Court found that the prohibitions on religious use in the lease and the Act served to satisfy the requirements that no specifically religious activity be supported.

■ The focus of our inquiry, therefore, must be whether sufficient safeguards exist to ensure that funds are not diverted to support religious activity. Such safeguards exist in the Maryland statute. The statute bars use of funds for sectarian purposes or to support seminary or divinity programs. The president of the institution must verify to the Council on Higher Education on two occasions each year that public funds have not and will not be used for sectarian purposes. The Council itself has administrative authority to perform such audits of public funds as may be necessary to satisfy the requirements of the statute. See Findings of Fact. This Court is satisfied that with one exception there are sufficient safeguards to prevent the use of the funds for sectarian purposes.

■ The only qualification to this general conclusion is as to theology and religion courses. The fact finder was unable to characterize the course offer-

7. The school analyzed in Hunt v. McNair, *supra*, provides a striking contrast to the five defendant institutions in this case. The board of trustees of that school were elected by the South Carolina Baptist Convention. The approval of the Convention was necessary for certain financial transactions, and only the Convention could amend the college charter. Nevertheless, the school was found to be similar to the institutions involved in *Tilton*.

The defendant Maryland schools are characterized by a high degree of institutional autonomy. The affiliated institutions exercise no control over the budget or policies of the schools. Only Western Maryland receives a small financial contribution and submits a statistical report to the affiliated church.

ings in these subjects available at the various defendant schools. Even though academic freedom prevailed at each defendant school and there was no indication that religious indoctrination was a goal of these schools, a possibility existed that these courses could be devoted to deepening religious experiences in the particular faith rather than to teaching theology as an academic discipline. Theology or its equivalent is a required course at each school and in each case is taught by a cleric of the affiliated church. Absent a clear indication that the theology was taught as an academic discipline, state aid to such programs cannot be justified. As no such indication exists as to these defendants, the Council on Higher Education must take steps to ensure that public funds are not used to support such programs.

The Council's failure to take such steps thus far, however, does not lead to a finding of unconstitutionality. As was noted in *Tilton*: "A possibility always exists, of course, that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement. . . . But judicial concern about these possibilities cannot, standing alone, warrant striking down a statute as unconstitutional." Tilton v. Richardson, *supra*, 403 U.S. at 679, 91 S.Ct. at 2096.

The excessive entanglement test is concerned in its administrative aspect that an aid program does not lead to government encroachment on the precincts of religion, and in its political aspect that religion does not intrude into the political process. In each case, some governmental involvement with religion is perhaps inevitable, *cf.* Walz v. Tax Commission, *supra* (governmental duty to ensure that only *bona fide* religious bodies receive tax exemption), but such entanglement must be kept to the minimum consistent with fulfillment of government responsibilities.

██ In evaluating administrative entanglement, the Court must examine three factors: The "character and pur-

poses of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." Lemon v. Kurtzman, *supra*, 403 U.S. at 615, 91 S. Ct. at 2112.

The character and purposes of the five defendant institutions have been discussed *supra* and in the Findings of Fact. It need only be noted that these schools perform essentially secular educational functions and are quite similar to the defendant schools in *Tilton*. Religion does not permeate the secular educational function of these schools.

The nature of the aid factor of the entanglement analysis focuses on the ideological neutrality or bias of the particular aid program. Thus, the Supreme Court has approved aid programs which provided funds for the construction of school buildings in *Tilton* and *Hunt* and has also approved loans of textbooks, *see* Board of Education v. Allen, *supra*, and money for bus rides, *see* Everson v. Board of Education, *supra*, requiring only that the aid given was itself ideologically neutral and required a minimum of government surveillance.

By contrast, the Supreme Court has disapproved aid programs which support building maintenance, *see* Committee for Public Education v. Nyquist, *supra*, and teachers' salaries, *see* Lemon v. Kurtzman, *supra*, or which assist the parents of school children, *see* Levitt v. Committee for Public Education, *supra*; Committee for Public Education v. Nyquist, *supra*.

██ What emerges from a consideration of these cases is the conviction that the ideological neutrality of a particular program of aid is dependent on the type of institution being benefited. The classroom buildings provided in *Tilton* and *Hunt* are no more neutral in the abstract than the classroom buildings which were maintained with public funds in *Nyquist*. The classes taught in the *Tilton* and *Hunt* classrooms are no more neutral than the classes taught by

publicly subsidized teachers in *Lemon*, all other things being equal. Obviously, all other things are not equal. What would be impermissible in an institution staffed by members of a particular faith, administratively controlled by a religious body, and dedicated to the inculcation of a particular faith, may well be permissible in an autonomous institution staffed by faculty hired on the basis of academic merit, where academic freedom prevails, and where courses are taught in accordance with the requirements of an academic discipline. The Court could validly require that the state monitor the content of teaching at the primary or secondary level to prevent even inadvertent lapses into religious indoctrination on the part of publicly subsidized teachers. Yet the Court could conclude that such monitoring would not be necessary at a college which maintained its academic freedom and integrity.

It is, therefore, not sufficient to argue, as plaintiff does, that the aid program here is not ideologically neutral because in some respects it may resemble aid programs previously found unconstitutional in a lower school context. In Hunt v. McNair, *supra*, 413 U.S. at 746, 93 S.Ct. at 2875 the Court said that " . . . the degree of entanglement arising from inspection of facilities as to use varies in large measure with the extent to which religion permeates the institution."

■ The Maryland aid program is characterized by direct non-categorical grants restricted by a prohibition on use for sectarian purposes. Leaving aside the question of the efficacy of this prohibition, the differences between this program and the *Tilton* program are more apparent than real. In *Tilton* direct grants were available for the construction of virtually any type of building, subject to similar prohibitions against sectarian usage. Thus, the *Tilton* funds were used to construct two libraries, a music, drama and arts building, a science building and a language laboratory. Every non-sectarian pro-

gram in the defendant colleges could be benefited by the federal aid program, and the difference between the *Tilton* aid program and the Maryland aid program thus resolves itself into a difference between construction grants and non-categorical grants. Clearly the latter distinction does not rise to constitutional dimensions.

■ The relationship between church and state which results from this aid program is not entangling. The program is administered by the Council on Higher Education which has considerable expertise as to the character and programs of the State's institutions of higher education derived from its other responsibilities. The Council performs a two-step screening process to ensure that funds are not improperly used. The first step requires the Council to eliminate schools which primarily award theological degrees. The second step requires that Council to examine the use made of funds by recipient institutions. *See* Findings of Fact.

Because of the nature of the recipient schools, there is no necessity for state officials to investigate the conduct of particular classes of educational programs to determine whether a school is attempting to indoctrinate its students under the guise of secular education. Such governmental monitoring of the context of an educational program, especially on religious grounds, would raise grave questions. Concern over this potential government role was clearly the heart of the Supreme Court's entanglement analysis in the primary and secondary education cases. *See* Committee for Public Education v. Nyquist, *supra*; Levitt v. Committee for Public Education, *supra*; Sloan v. Lemon, *supra*; Lemon v. Kurtzman, *supra*. However, the procedures in the Maryland program have been found to be effective and non-judgmental.

The procedural posture of this case has prevented the development of follow-up procedures to ensure that no state funds are converted to religious uses in later years. However, unlike the

20-year restriction held unconstitutional in *Tilton*, the prohibition on sectarian use in the statute is absolute, and the Council seems aware of its responsibilities in this matter. The Court is satisfied that adequate, non-entangling follow-up procedures will be developed. *See* Findings of Fact.

Three factors in *Tilton* were found to have mitigated the degree of enganglement in the federal aid program. 1) The aid provided was found to be religiously neutral. 2) The recipient schools were characterized by an absence of religious indoctrination. 3.) The aid was in the form of a "one time construction grant."

 As noted *supra*, the neutrality of the aid is dependent upon the essential character of the school. Where the secular aspects of a school may be separated from the sectarian, as in the case of these defendants, aid to the sectarian aspect, regardless of the form of the aid, will necessarily be religiously neutral. The aid in this program is restricted to the secular aspects of the institutions.

It has been found that religious indoctrination is not a purpose of these institutions. Although each school has as a secondary purpose the encouragement of the spiritual development of the students, at none of these schools does this encouragement go beyond providing opportunities for religious experience. The religious programs at each school are separable from the secular programs, and the latter are the only beneficiaries of state aid.

Although the Maryland program does not provide "one time construction grants," the continuing nature of the program is not constitutionally fatal. Even *Tilton* required a continuing and perpetual involvement of the government with the schools to ensure that publicly financed buildings would never be used for sectarian purposes. However, an analysis of the aid program in Hunt v. McNair, *supra*, is far more revealing of the degree of involvement which is constitutionally permissible.

The South Carolina Educational Facilities Authority has the power to issue revenue bonds by which school buildings and facilities could be constructed. If the authority financed construction of a building, the school could, as in Hunt v. McNair, *supra*, convey the building to the State Authority and lease back the building for use. The lease and the statute both contained restrictions against sectarian use. The Authority was given the power to issue regulations and to set fees for the use of the facilities. A decision of the South Carolina Supreme Court limited the Authority's fee-setting and rule-making powers to the establishment of a fee schedule which would ensure repayment of the revenue bonds. In the South Carolina scheme, the state administrative agency acted as the recipient institution's landlord and acquired substantial control over the school's ability to set its own fees and charges. The Supreme Court found the South Carolina statute to be constitutional even though it established a school-governmental relationship which was far more intimate and pervasive than any relationship likely to result from the statute now under consideration. *See* Hunt v. McNair, *supra*.

The Supreme Court has yet to elaborate on the political entanglement test. However, the Court's primary concern is that society be spared the trauma of political strife on religious grounds over governmental benefits. Aid programs to primary and secondary schools have been found to contain the seeds of such strife. As an example, 85% of the students in New York State who were benefited by the statute held unconstitutional in Committee for Public Education v. Nyquist, *supra*, were attending church-affiliated schools, primarily of the Roman Catholic faith. The Court noted that annual appropriations and the prospect of an increasing demand for public funds created a potential for political-religious conflict. *See also* Lemon v. Kurtzman, *supra*.

However, in Tilton v. Richardson, *supra*, the Court distinguished higher edu-

cation from secondary and primary education as to political effect. "The potential for divisiveness inherent in the essentially local problems of primary and secondary schools is significantly less with respect to a college or university whose student constituency is not local but diverse and widely dispersed." 403 U.S. at 688–689, 91 S.Ct. at 2101. The Court also noted that the same factors which mitigated administrative entanglement also mitigated political entanglement.

■■■ This Court is satisfied that the Maryland statute does not create a substantial danger of political entanglement even though the Maryland program calls for annual appropriations, and the recipient schools are likely to request additional aid. As in *Tilton,* the factors which mitigated the administrative entanglement also served to mitigate political entanglement. Of greater importance in mitigating the effect of religious divisiveness is that the program is designed to aid higher education generally, not church-affiliated colleges specifically. Only five of the eighteen eligible institutions which have received funds are church-affiliated. Unlike the *Nyquist* situation, this program does not primarily aid one particular religious group with a large educational establishment. Furthermore, the defendant schools are substantially autonomous institutions, whereas the *Nyquist* schools generally were subject to the direct control of the affiliated church. Political conflict over the size of allocations or the scope of programs in Maryland are not likely to involve the affiliated churches to a major degree in the political controversy. The controversies which result from the program are likely to involve questions of fiscal responsibility and educational requirements rather than questions of the religious identity of recipient schools.

This Court must, therefore, conclude that Md.Ann.Code art. 77A §§ 65 et seq., as amended in 1972, is constitutional. ■■■ The original version of this Act, passed in 1971, provided no restrictions on sectarian use of funds. Accordingly, the 1971 version was unconstitutional. As substantial funds were paid out in 1971 to the five schools, this Court must decide whether to order the recipient schools to refund the illegally paid funds to the State of Maryland.

■■■ The question is governed by Lemon v. Kurtzman, 411 U.S. 192, 93 S. Ct. 1463, 36 L.Ed.2d 151 (1973) (*Lemon II*), in which the Supreme Court refused to order the refund of moneys paid out under the statute held unconstitutional in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (*Lemon I*). In *Lemon II,* the Court noted that in recent years newly developed principles of law, both constitutional and non-constitutional, frequently have not been accorded retroactive effect. *See* Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The decision to apply a principle retroactively is based on an equitable balancing between the interests of the state and of the party acting in reliance on the prior principle. The Court used the test set forth in *Linkletter,* supra, to analyze the problem. A court must look to the prior history of the rule, the purpose and effect of the rule, and whether retrospective operation will tend to further or retard the rule's operation.

The Court refused to order a refund in *Lemon II.* In *Lemon I* the plaintiff had filed suit months after payments were made and had refrained on tactical grounds from seeking an injunction. No further entanglement or primary effect of advancing religion was foreseen as a result of permitting defendants to keep funds. The schools had relied to their detriment on the funds in planning their programs, and the decision in *Lemon I* could not have been anticipated. The Court observed that, realistically, people and institutions must conform to the law as it presently exists, not as it may be construed to be after subsequent court decisions. A court decree in equity based on a new principle should seek to work the least harm consistent with the purposes of the new rule.

In this case, suit was filed nine months after enactment of the statute and five months after payments were made. The defendants have already spent the funds allocated for 1971 in reliance on the constitutionality of the program. Both *Lemon I* and *Tilton* were decided after the enactment of the statute and the expenditure of the funds and could not have been anticipated. *See* Lemon v. Kurtzman, *supra.* Furthermore, the 1972 Legislature corrected the defects in the original Act by prohibiting sectarian use of the funds, thereby substantially eliminating the danger of unconstitutional use of funds. The constitutional values to be protected by the Establishment Clause would not be furthered by refund despite the unconstitutionality of the 1971 version of the Act.

Accordingly, it is this 16th day of October——, 1974, by the United States District Court for the District of Maryland, ORDERED and DECLARED that:

1. Md.Ann.Code art. 77A, §§ 65 et seq. is constitutional on its face and as applied.

2. Plaintiff's motion for injunction of the application of Article 77A, §§ 65 et seq. be, and the same is, hereby denied.

3. Plaintiff's motion for refund of aid program be, and the same is, hereby denied.

### APPENDIX

### FINDINGS OF FACT

#### I

Four Maryland citizens and taxpayers have challenged the constitutionality of a state law under which public aid is given to non-profit private institutions of higher learning. Claiming that the statute, Art. 77A, §§ 65–70, Annotated Code of Maryland, violates the Establishment clause of the First Amendment, plaintiffs seek an injunction to prevent the state from paying aid pursuant to the Act and a declaration that all funds received by the recipient institutions be paid over to the state with interest. Defendants are the Governor, Comptroller and ·Treasurer of the State of Maryland, all of whom constitute the Board of Public Works of the State of Maryland, and five of the 18 institutions of higher learning which are recipients of aid under the challenged statute.[1]

Plaintiffs originally coupled their Establishment claim with a contention that the statute violates the Free Exercise clause as well, and were originally joined in their suit by two organizations. The complaints of the two organizations were dismissed for lack of standing, and the Free Exercise claims of the four individual plaintiffs were similarly dismissed. As taxpayers, the remaining plaintiffs have standing to challenge the statute in question on Establishment grounds. Jurisdiction is based on 28 U.S.C. § 1331. A district court of three judges was convened pursuant to 28 U.S.C. §§ 2281 and 2284.

The challenged statute provides aid directly to each institution, in proportion to the number of associate or bachelors degrees awarded by it in the fiscal year next preceding the fiscal year in which payment is made.[2] The recipient institution "cannot be one awarding only seminarian or theological degrees," Art. 77A § 66(d), Annotated Code of Maryland, and state money cannot be used for "sectarian purposes," 'Art. 77A, § 68A, Annotated Code of Maryland.

---

1. Western Maryland College, College of Notre Dame, Mount St. Mary's College, Saint Joseph's College, and The Associated Professors of Loyola College in the City of Baltimore, Inc. (Loyola College). Western Maryland is affiliated with the Methodist Church. The other four defendants are affiliated with the Roman Catholic Church.

2. In November, 1971, based on degrees awarded in 1970–71, 17 recipients received some 1.7 million dollars in aid, the five defendants receiving approximately $520,000. The following year, 1.8 million dollars was awarded to 18 recipients. Of that sum, $603,000 was placed in an escrow account for the defendants pending the outcome of this litigation.

## II

The threshold factual question is a determination of the purpose for the legislative action. The purpose for this statute is clearly secular. It had its origin in an analysis of Maryland higher education done by the Maryland Council on Higher Education. Included in this analysis was a statistical description of the tremendous money savings to the state from the system of private colleges. The continuation of the aid program has been bolstered by a later report by the Council, which has administrative responsibility under the Act, concerning the uncertain nature of private college finances, even with the state aid program. State aid to church-related colleges is not necessarily sectarian in purpose. Tilton v. Richardson, 403 U.S. 672, 678–679, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). The state purpose here is clearly not.

Despite a secular purpose, a state law violates the Establishment clause if the primary effect is to advance religion. An aid program need not have the primary effect of advancing religion unless recipient institutions are so permeated by religion that the secular side cannot be separated from the sectarian. The defendants here are not in that pervasively sectarian category.

Not only has there been no showing that religion slants the conduct of classes at the defendant institutions, this litigation has demonstrated the opposite to be true. The most potent evidence in this regard is the uncontroverted testimony of numerous members of the faculty of each defendant. They feel no religious pressures, by anyone, on their classroom presentation or their selection of texts and course materials.[3] Even a former faculty member of Mt. St. Mary's called by plaintiffs to testify to his disagreement with certain aspects of the administration of that college,

agreed that his freedom to conduct classes without regard to religious considerations had never been impinged. Each defendant subscribes to the 1940 Statement of Principles on Academic Freedom of the American Association of University Professors, and each obviously abides by it.

Plaintiffs have demonstrated that there is a practice at several of the defendants of starting classes with prayer. There is no such practice at Western Maryland College, and the extent of prayer in class varies widely among the four remaining defendants. At Loyola and Mt. St. Mary's, the percentage of classes which start with prayer is miniscule. At St. Joseph's College and Notre Dame, those classes which do start with prayer often do not utilize what would be called a traditional form of prayer, and students join in or not at their option.

The figures on the number of instructors who begin class with prayer and the number who do not bear out the testimony of witnesses for each defendant that there is no actual college policy encouraging prayer in class. It is treated as a facet of the instructor's academic freedom. Moreover, plaintiffs failed to establish that beginning a class with prayer in any way diminishes the atmosphere of intellectual freedom which marks these colleges. In fact, at St. Joseph's College, the only defendant at which a majority of classes start with prayer, a Maryland education department group which monitored the teachers education program at the College saw no evidence of religion entering into any elements of that program. It appears that prayer in class is as peripheral to the subject of religious permeation of an institution as are the facts that some instructors wear clerical garb, and some classrooms have religious symbols. None of these facts impairs the clear

---

3. The Court has been presented with book lists for four of the five defendants. In each instance, for courses covering the spectrum of a liberal arts program, the book lists seem standard fare, and plaintiffs did not point out counter examples. The fifth defendant, Mt. St. Mary's, produced testimony that selection of textbooks was within the discretion of the individual teacher.

and convincing evidence that courses at each defendant are taught "according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards." Tilton v. Richardson, *supra,* 403 U.S. 681, 91 S.Ct. 2097.

A finding that there is substantial academic freedom for individual instructors leads to a conclusion that religion does not permeate the secular side of the college only if religion plays no part in hiring decisions. The faculty hiring picture is complex. At Notre Dame and Mt. St. Mary's, no inquiry is made into an applicant's religion. At Western Maryland there is no formal inquiry, but a former President often inquired, in order to fully appreciate the applicant's background. A similar rationale supports the religious preference blanks on the application form for Loyola. In addition, Loyola attempts to recruit to its faculty each year two members of a religious order which once staffed a college recently merged into Loyola. At both Notre Dame and St. Joseph's College, members of religious orders of women receive less than full faculty salary, and although budgetary considerations lead the colleges to favor a member of an order, the main criteria for hiring is academic quality.

Despite this variety of hiring situations, two things are common to each defendant. Hiring decisions are effectively low-level and participatory. And at no defendant was there such dominance on the faculty by one religious group that hiring bias would escape the attention of members of other religious groups. Even more importantly, the faculty members of each defendant, many of whom testified, impress the Court as professionals who value academic freedom and see no place for religious bias in liberal arts education. If there were an effort by any defendant to stack its faculty with members of a particular religious group, it could not have escaped the attention of the present faculty, and they would have complained to their local chapter of the American Association of University Professors, or to the college administration. Plaintiffs showed no instance of either.

Though the above represents a finding as to faculty hiring generally, the hiring patterns for religion or theology departments are a special case and present a unique problem. All five defendants staff their religion or theology departments chiefly with clerics of the affiliated church. At two defendants, Western Maryland and Mt. St. Mary's, *all* members of the religion or theology faculty are clerics. The problem presented by the make-up of these departments is obvious. Recognition of the academic freedom of these instructors does not necessarily lead to a conclusion that courses in the religion or theology departments at the five defendants have no overtones of indoctrination. Moreover, an examination of book lists in these courses is relatively meaningless. There will necessarily be "religious" titles, and a court cannot make a finding that certain texts indoctrinate and certain inquire.

Therefore, although the Court finds that the extent of academic freedom at each defendant belies a finding that any of them are "pervasively sectarian," Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Court is unable to characterize the manner in which theology and religion courses are conducted. Those courses notwithstanding, the extent of academic freedom at each institution, coupled with the more intangible factors that determine an institution's "atmosphere," discussed below, lead to a conclusion that each defendant is "characterized by an atmosphere of academic freedom rather than religious indoctrination," Tilton v. Richardson, *supra,* 403 U.S. 681, 91 S.Ct. 2097, and therefore that the primary effect of aid to these defendants is not to advance religion.

III

To determine whether the statute's administration entangles the state with religion, it is necessary to first deter-

mine whether religious indoctrination is a substantial purpose or activity of the recipients, and then consider the nature of the aid program involved. The record and testimony in this case amply support a finding that at none of the defendants is religious indoctrination a substantial purpose or activity. Plaintiffs did demonstrate that each of the defendants, with the exception of St. Joseph's College, have, or recently had, quotas for membership on the governing board based on religion or membership in a religious order. Moreover, for each defendant the religious affiliation of the college would be readily apparent to any prospective applicant who took the time to read the catalogue. Such formal matters are relevant, but are not controlling when more reliable indications of the "atmosphere" of the institution evoke a different picture. Hunt v. McNair, *supra*.

With the exception of Western Maryland, none of the defendants receive aid from or make reports to an institutional church. Western Maryland receives annual stipends from the Methodist Church in a very modest amount, and makes annual statistical reports to the national Methodist Church. There is no effort by the Church to parlay the funds or reports into control over the college. Similarly, though the local head of the Catholic Church is an *ex officio* member of the Mt. St. Mary's Board of Trustees, no instance of entry of Church considerations into college decisions was shown.

No aspect of the student conduct code at any defendant institution has any religious content.[4]

The great majority of students at each of the institutions affiliated with the Catholic Church are Catholic, and Methodists comprise the largest single religious group at Western Maryland.

However, thorough analysis of the student admission and recruiting criteria of each defendant demonstrates that the student bodies are chosen without regard to religion.

Religious exercises are held on the campus of each defendant, though none of the defendants require attendance at any religious exercise.[5] Each defendant has a chaplaincy program,[6] and at each defendant the principal chaplain is a clergyman of the affiliated church. The Campus Ministry at Loyola, the chaplain and the Religious Life Council at Western Maryland, and the chaplain programs at the remaining defendants, each serve to encourage spiritual development of the students, which the Court finds to be one secondary objective of each defendant. Representatives of each defendant candidly admitted that their institution is interested in encouraging spiritual interests. These admissions complement the Court's conclusion drawn from other aspects of the evidence and testimony. Though some of the defendants seem more caught up in this idea than others, at none of these institutions does this encouragement go beyond providing the opportunities or occasions for religious experience.

The theology and religion courses of each defendant must be viewed in the light of that shared objective. While most of the defendants do not offer majors in religion or theology, each maintains a vigorous religion or theology department. The primary concern of these departments, either admittedly or by the obvious thrust of the courses, is Christianity. As already noted, the departments are staffed almost entirely with clergy of the affiliated church. At each of the defendants, certain of these courses are required.[7]

4. An ambiguous reference in Mt. St. Mary's Code was shown not to have been inspired by religious considerations.

5. Though the Baccalaureate ceremony at each defendant is religious, there seems to be no real compulsion for students to attend.

6. Evidence adduced at trial indicates that a majority of American liberal arts colleges have chaplains.

7. Western Maryland combines philosophy and religion in one department, and permits students to select a philosophy rather than a religion course. The department is wholly staffed by Methodist ministers.

The Court has already stated its view that it is neither legally empowered nor genuinely able to characterize the manner in which theology and religion are studied at these schools. It may be that at each the subjects are approached as complex and intriguing intellectual disciplines. However, a department staffed mainly by clerics of the affiliated church and geared toward a limited array of the possible theology or religion courses affords a congenial means of furthering the secondary objective of fostering religious experience. Only the clearest indication that the religion or theology department is an amalgam of people interested in the study of the religious phenomenon or experience, rather than in experiencing religion, justifies state support of the department in the light of that secondary objective. There has been no such indication for any of these defendants. However, the Court's findings as to the chaplaincy program and the religion or theology courses do not impair the general finding that religious indoctrination is not a substantial purpose or activity of any of these defendants.

With that general finding in mind, a description of the administration of the statute is in order.

Primary administrative responsibility for the aid program is vested in the Maryland Council for Higher Education. That responsibility is complemented by the Council's other responsibilities for higher education in Maryland, which do not derive from the challenged statute but do give the Council and its professional staff considerable expertise with regard to each recipient.

The Act prescribes two levels of screening. The first is a pre-eligibility determination based primarily on the Act's requirement that aid not go to institutions awarding primarily theological or seminary degrees. Several institutions have been disqualified in this manner, and there has been no serious suggestion that institutions found eligible violate the standard, or that this determination entangles the Council in religion.

The second level of screening is a determination of whether state funds have been improperly used. After the program was in operation and one year's funds awarded, the statute was amended to prohibit the use of state funds for "sectarian purposes." Chap. 534, 1972 Laws of Maryland, Art. 77A, § 68A, Annotated Code of Maryland (1969 Replacement Vol.). That statutory stricture is implemented through requirements of verification by the college president before receipt that funds will not be improperly expended, and verification one year thereafter that funds have not been improperly used. The Council requires sufficient detail, through follow-up on the usage description which accompanies the second verification, to determine whether the expenditure was for sectarian use. (The pre-amendment funds awarded for degrees conferred during the 1970–1971 academic year were never subjected to this second level of screening.)

The usage verification and the normal annual accounting which each college conducts obviate the need for state post-audit analysis in every case. Such analysis is available when needed, however. State auditors could accomplish a post-audit analysis, using accepted accounting techniques, in one day or less.[8] This mechanical accounting of state grant expenditures is not entangling. It is done now for federal programs by these same institutions. It is quick and non-judgmental.

The administering body has not yet developed a systematic follow-up procedure to insure that state grants made now are not converted to sectarian or re-

---

8. Recipients could minimize even this nominal degree of auditing by designating a special account for the state grant, and locating all supporting documents for that account in one place.

ligious usage some years hence. The Act places no time limit on its prohibition of sectarian usage, however, Art. 77A, § 68A, and testimony disclosed that the administering body clearly understands that sectarian usage is forbidden, no matter when it occurs. In the face of the Act's prohibition and the administering body's understanding of it, the Court cannot surmise that the follow-up procedures which are eventually routinized will prove inadequate.

Except for this follow-up monitoring, there is no need for additional supervision by the Council over the recipients. The Council has shown no indication to enmesh itself unnecessarily in the recipients' affairs. The Act does not require administrative entangling, there is no entanglement in the present procedures, and no cause to speculate that the Council will redefine its responsibilities to create problems in the future.

The evidence indicates that there are institutions, which are able to pass the state's initial screening, at which the study of religion or theology may become an instrument for strengthening the students' religious life. Yet the Council has taken the position that state funds may be used for religion and theology courses. The Court's conclusion that this is improper as to these defendants has already been noted. Were the Council to make a yearly inquiry similar to that which the Court has made, the risk of the Council becoming entangled with religion would be great. To avoid a requirement that the state minutely scrutinize each recipient's religious stud-

ies program or otherwise enmesh itself in potentially religious matters, the Act must be administered so as to prevent any state funds from supporting the religious studies or theology programs at any institution. "Sectarian purposes," as that term is used in Art. 77A, § 68A, must be interpreted as encompassing the study of religion or theology.[9]

### IV

Each defendant received a state grant on November 5, 1971, based on degrees conferred during the academic year 1970–1971. Art. 77A, § 68A and the corresponding state monitoring procedure were not added to the program until 1972. Three of the five defendants effectively commingled the 1971 grant with general college operating funds. Loyola, by contrast, used the state money solely for scholarships. Mount St. Mary's employed restricted funds accounting, and demonstrated that no part of the grant, except the interest it earned, was used for sectarian purposes.

The consolidated findings of fact herein are made following the conclusion of the evidence submitted during the trial and following argument from all counsel on the proposed findings, and are intended to form the findings submitted to the three-judge court.

ALBERT V. BRYAN, Senior Circuit Judge (dissenting):

The first Amendment's Establishment of Religion clause[1] is here pressed to vitiate Maryland's monetary aid to the five defendant private institutions[2] of

---

9. The Court does not believe that the study of religion or theology is necessarily sectarian, and makes no finding as to whether it is sectarian at any of the defendant institutions.

1. The First Amendment is applicable to the laws of each State through the Fourteenth Amendment. Murdock v. Pennsylvania, 319 U.S. 105, 108, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

2. References herein to the defendant colleges are not intended to include St. Joseph's College, since it is no longer a subsisting institution.

Nor is Western Maryland College included, for I find it is no longer a church-affiliated or church-related institution within the scope of the constitutional inquiry now before the court. Plaintiffs in answer to this defendant's interrogatories explicitly disclaimed any contention that it is a school of that character and also disclaimed other immediately related aspects of the school's structure. On January 10, 1974—just four days before the fact findings were filed in this case—the previous budget provision by the Methodist Church for this college was, at the latter's request, discontinued for the future. Thus to my mind, if it once existed,

higher learning under Annotated Code Art. 77A, §§ 65–70. Disagreeing reluctantly with the majority, I find the Act *in these instances* .does in truth offend the Constitution by its provisions of funds, in that it exposes State money for use in advancing religion, no matter the vigilance to avoid it.

I. The legislation must be conceded to be secular in purpose, and so the first point for consideration is whether each of the three remaining defendant institutions is a church-affiliated or church-related body. It is hardly deniable that all of them are of this category.

According to the court's findings, they maintain a "vigorous religion or theology department" and the "primary concern of these departments, either admittedly or by the obvious thrust of the courses, is Christianity". Moreover, these departments are staffed almost exclusively with clerics wearing their affiliated churches' ministerial vestments. Also in its findings the court sees itself "unable to characterize the manner in which theology and religion are conducted" and feels obliged to make "no finding as to whether [the study of religion or theology] is sectarian at any of the defendant institutions".

The colleges' religious affiliations are at once readily and immediately made known in the college catalogues. Religious exercises in the faith of the church are conducted on the campuses, but attendance is not compulsory. In some classrooms there are religious figures and pictures. Quite understandably the large majority of students in each institution in suit attends the church of its religious persuasion. Every college has a chaplaincy program, with the chaplain a clergyman of the affiliated church.

While the instruction, liturgy and symbolisms just mentioned are to be honored at all times and in all places, to me

these incidents quite clearly depict the colleges as church-affiliated or church-related. Indeed, this conclusion appears not to be seriously debated.

II. The next question is whether the instant college-aid programs may in primary effect affront the Act's interdiction of the use of State money for sectarian purposes. I think they do.

It is the *potential* use of the moneys which is the determinant to be looked to in appraising the constitutionality of State monetary aid to church-affiliated or church-related institutions, as I read the Supreme Court's enunciations. The legality of the moneys' utilization is not finally and conclusively resolved by the *actual* use of the funds, no matter how neutral, bona fide or praiseworthy. It is the reasonable opportunity for sectarian misapplication that is the gauge of the validity of the statute's particular beneficence. Lemon v. Kurtzman, 403 U.S. 602, 617–619, 623, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[3] Otherwise, unintended circumvention would escape the First Amendment's unrelenting veto. The present grants must, therefore, be scrutinized for contingencies of this nature.

Of telling decisiveness here is the payment of the grants directly to the colleges unmarked in purpose. These features were decried in Levitt v. Committee for Public Education, 413 U.S. 472, 480, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Committee for Public Education v. Nyquist, 413 U.S. 756, 774, 93 S. Ct. 2955, 37 L.Ed.2d 948 (1973), and Lemon v. Kurtzman, supra, 403 U.S. 602, 621, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). There, the potential of misuse was existent because of the lack of a definitive plan of application, such as the designation of worthy needs or of desired improvements, for example, professors' salaries, books, buildings and like objectives.

all such affiliation or relationship of college and church was terminated.

3. While *Lemon* and other cases, cited *post*, such as *Allen, Levitt, Everson* and *Nyquist,*

deal with primary or secondary schools, the principles therein laid out are general in their appositeness.

Presently the Act is simply a blunderbuss discharge of public funds to a church-affiliated or church-related college. There is only a single warning of the forbidden use and that merely in a phrase of utmost generality: "sectarian purposes". Noteworthy, the funds *could* be devoted to the compensation of the theology faculty. One of the faculty members in each college is the chaplain. This is but one example of the overlap of academic and theological salaries. Beyond peradventure, save for the self-restraint of the college administrators and without their faithful attention, the grants could well, though proscribed, go into secular and sectarian areas at the same time. These could be menial or professional services, or building and grounds maintenance, related to both purposes. Levitt v. Committee for Public Education, supra, 413 U.S. 472, 479, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973). Research discloses to me no comparable carte blanche power of expenditure permissibly conferred by a State upon church-affiliated or church-related institutions. Surely, that potential for abuse is here, and only through honesty has deflection of the money been avoided.

The infirmity of non-prescription of the objects of the State aid is exquisitely demonstrated in Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). There the United States authorized grants to colleges for the construction of academic facilities except a facility to be used for sectarian purposes. The Government reserved a 20-year interest in the units to be built so as to insure enforcement of the proviso. The Court held that limiting the prohibition to 20 years opened the facility for utilization for *any* purpose after the expiration of 20 years, and for this reason the aid tolerated a grant of the post-20-year period for use for sectarian objects. This decision trenchantly confirms that possible utilization of public property in advancing religion is ipso facto inhibited.

III. The "sectarian purposes" outlawed by the Act, the fact findings in this case conclude, "must be interpreted as encompassing the study of religion or theology". p. 1297. As previously explained, all of the defendant colleges have an alive religion or theology department. At each of them certain courses in these subjects are mandatory. While the fact findings say that the two teachings are approached as complex and intriguing intellectual disciplines, it adds, "[h]owever, a department staffed mainly by clerics of the affiliated church and geared toward a limited array of the possible theology or religion courses affords a congenial means of furthering the secondary objectives of fostering religious experience". Another finding acknowledges:

"Recognition of the academic freedom of these instructors *does not necessarily lead to a conclusion that courses in the religion or theology departments at the five defendants have no overtones of indoctrination.*" (Accent added.)

Thus, obviously, the departments of theology have been quickened into a significant sectarian area of education. With a department so inspirited and with its staff and faculty composed of religious or theological clerics, a resulting expansion of the school of theology seems logically at once at hand. With this mounting potentiality, religious teaching might quite readily permeate and pervade the college. Consequently, the allocation of State moneys to include this growing religious segment could mean that this effectuation of the Act may equate it to a "law *respecting* an establishment of religion".

IV. Potentiality is also an assaying factor in measuring whether the Act's play within the colleges creates "an excessive government entanglement with religion". Lemon v. Kurtzman, supra, 403 U.S. 602, 613–614, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745; Walz v. Tax Commission, supra, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697; Levitt v. Committee for Public Education, 413 U.S. 472, 480–482, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); see also Committee for Public Education

v. Nyquist, 413 U.S. 756, 794, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Instantly the possibility is real and manifold. This is attributable to the complete absence of any appointment of the objects of the Act's bounty when extended to church-affiliated or church-related entities. In this context, to be assured that none of the public funds kindle or fire religion and theology, a closer oversight is required of the appropriation and application of the grants than in secular schools. Thus unavoidably the State is drawn into frequent and constant touch with the fiscal affairs of each college. This could easily generate controversy.

True, periodical reports may be expected of the colleges of the grants' use, with verification by accountants in audit analyses. But, I fear, the tracking down of the moneys would require exceptional safeguards against overflow of religion and theology into the purely academic curricula. This guardianship could lead to excessive entanglement of the State with the colleges.

The following summation from *Lemon*, 403 U.S. 602, at 621–622, 91 S.Ct. 2105, at 2115 seems apt:

"The history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance. The government cash grants before us now *provide no basis for predicting that comprehensive measures of surveillance and controls will not follow.* In particular the government's post-audit power to inspect and evaluate a church-related school's financial records and to determine which expenditures are religious and which are secular *creates an intimate and continuing relationship between church and state*". (Accent added.)

It is but another risk of encroachment on the Act's ban.

Because of the potentialities posed throughout this dissent, I think the Act is unconstitutional when adapted to the three now-defendant colleges, despite the integrity of the latters' use of the moneys and despite the welcome help of such institutions in providing public education.

V. Recovery of payments already disbursed by the State is not in my judgment equitably demandable. The recipients relied in good faith on the State funds, and doubtlessly assumed obligations in anticipation of them. In my opinion this disposition of the reimbursement claim is sustainable. Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

In fine, I deferentially hold the view that an injunction should issue as prayed in the complaint, stopping future payments under the Maryland Act to the three defendant colleges.