## CIRCUIT COURT OF ALBEMARLE COUNTY

Industrial Development
Authority
of Albemarle County

v.

Daniel N. Mohler et al.

April 3, 2000

Case No. CL99-8127

BY JUDGE PAUL M. PEATROSS, JR.

This matter comes before the Court on the Motion for Judgment of Plaintiff, the Industrial Development Authority of Albemarle County, Virginia (The "IDA"), seeking a final order validating (1) certain of its conduit revenue bonds in an amount not to exceed $14,000,000.00 (the "Conduit Bonds") and (2) certain proceedings taken in connection with their authorization and issuance. The Conduit Bonds would be issued for the benefit of The Covenant School, Inc. ("CSI"), an accredited, non-profit, private institution of elementary and secondary education in the Commonwealth and would finance certain projects authorized by the Industrial Development and Revenue Bond Act (The "Act"), Virginia Code § 15.2-4900 *et seq.* at CSI. Pursuant to Virginia Code § 15.2-2653, Defendant taxpayers Daniel N. Mohler, Mary Ellen Sikes, and John Marshall challenge the constitutionality of the issuance of these Conduit Bonds as violating the Establishment of Religion Clauses in the First Amendment to the United States Constitution and Article I, § 16, of the Virginia Constitution. The Court heard evidence and able argument on this matter in a hearing on February 28, 2000. After carefully considering that evidence, together with counsels' memoranda and the authority cited therein,

the Court now grants the Motion for Judgment and, pursuant to § 15.2-2654, validates the issuance of the Conduit Bonds and the related proceedings.

*Facts*

The IDA is a political subdivision of the Commonwealth, established by the Board of Supervisors of Albemarle County to carry out the purposes of the Act, including the financing of "facilities" at private, non-profit institutions in the Commonwealth "whose primary purpose is to provide collegiate, elementary, secondary, or graduate education and not to provide religious training or theological education." Va. Code § 15.2-4902. Such "facilities" must be "for use as academic or administrative buildings or any other structure or application usual and customary to a[n] … elementary or secondary school campus other than chapels and their like." *Id.* Since 1991, the IDA has completed sixteen bond issues for private, non-profit institutions, including Our Lady of Peace Nursing Home, Tandem Friends School, and Westminster-Canterbury of the Blue Ridge, which are church-affiliated, as well as UVA Health Services and Real Estate Foundations, Martha Jefferson Hospital, and Eldercare Gardens, which are strictly secular institutions. Similar bonds issued through other authorities have been validated for other church-affiliated schools in the Commonwealth, including for Church Schools in the Diocese of Virginia, *see IDA of City of Alexandria v. Statutory Defendants et al.*, CL 99-0696 (Cir. Ct. of Alexandria, October 25, 1999); Catholic High School, *see IDA of County of Isle of Wight v. Taxpayers et al.*, L. 99-70 (Cir. Ct. Isle of Wight, May 25, 1999); and Eastern Mennonite University, *see IDA of City of Rockingham v. Taxpayers et al.*, L. 95-10479 (Cir. Ct. Rockingham, November 30, 1995); but a proposed issue was refused for Regent University, *see VCBA v. Statutory Defendants*, LF 99-1527 (Cir. Ct. Richmond, August 19, 1999).

CSI describes itself as a K-12 "college preparatory, non-denominational, Christian day school" that is "committed to providing a traditional education with strong academic standards." Pl.'s Ex. 1. Its motto is "Academic excellence under the sovereignty of God." *Id.* Its actual academic achievement is reflected in high average scores on standardized tests such as the SAT and Advanced Placement exams and in admissions to selective colleges and universities such as Smith, Swarthmore, Duke, and the University of Virginia. *See* Pl.'s Ex. 30. The Lower School curriculum includes foreign languages, language arts, math, fine arts, Bible, history, science, and physical education. The Upper School "offers a rigorous comprehensive academic program to prepare students for college. The curriculum explores the best of classical and

modern thought and civilization, science and mathematics, foreign language (Spanish, Latin, and French) and the fine arts. Honors and Advanced Placement Courses are offered." Pl.'s Ex. 1. The math, history, and science textbooks listed in the curriculum are national standards, and the literature and drama curricula include such challenging works as *Lord of the Flies, Tess of the D'Urbervilles, Heart of Darkness, The Awakening, Waiting for Godot,* and *Rosencrantz and Guilderstern Are Dead. See* Pl.'s Ex. 3. Science classes explore theories of human evolution, contraception and abortion, and genetics. *See* Pl.'s Ex. 17-20. A Bible class is required at all grade levels "in order to attain a deeper knowledge of God and His church, to obtain skills for clarifying, developing, and articulating a world view, and to apply biblical truth to all life." Pl.'s Ex. 27 at 33. Bible classes constitute approximately 5% of entire instruction. Testimony of Ronald P. Sykes on February 28, 2000.

The school is administered by a non-profit corporation under a self-perpetuating Board of Directors made up of parents and community leaders and "is not an ecclesiastical body nor is it subject to any ecclesiastical organization." Pl.'s Ex. 33 at 2. The Preamble to the Bylaws sets forth "basic principles for Christian education" and asserts: "The basis of The Covenant School, Inc., is the scriptures of the Old and New Testaments, the infallible word of God, as interpreted in the historic Christian Confessions." *Id.* CSI requires its faculty to adhere to general Christian beliefs, but it is the policy of CSI that faculty and administrators must neither attempt to impose any religious beliefs on students nor demand adherence to any particular religion, and that they must take care not to denigrate other denominations or religions or their members. Testimony of John K. Taggart, III, on February 28, 2000. CSI is accredited by the Virginia Association of Independent Schools, which is the primary accreditation body of private schools in Virginia and maintains academic freedom requirements for its member institutions. Weekly chapel attendance is required in order to gather the students together as a community, the services are non-denominational and do not restrict themselves to a particular theology. The services, which are held once a week for 30-45 minutes, include Bible discussion, non-denominational prayer, and singing but do not mandate worship and encourage individual religious expression. The services are led by a chaplain who is not required to be a member of any particular denomination or church, but he is required to be a Christian. Testimony of Ronald P. Sykes on February 28, 2000. CSI "does not discriminate on the basis of race, color, sex, nationality, religion, or ethnic origin in the administration of its educational policies, admission policies, financial aid awards, athletic, and other school-related programs." Pl.'s Ex. 1 at 2.

The 640 students attending CSI are not required to profess any particular faith to be admitted or continue as a student at the school. Muslim, Buddhist, and Jewish students currently attend CSI. Testimony of Ronald P. Sykes on February 28, 2000.

On December 9, 1999, the IDA determined that CSI and the bond projects qualified under the Act and accordingly approved the issuance of the Conduit Bonds. The IDA declared that CSI "is a private, accredited, and nonprofit institution of elementary and secondary education and not to provide religious training or theological education" and that the bond proceeds will fund "facilities for use as academic or administration buildings and other structures or applications usual and customary to an elementary and secondary school campus." Pl.'s Ex. 34 at 1. The IDA determined that this conduit financing "will be in the public interest of the inhabitants of Albemarle County, Virginia, and the Commonwealth of Virginia." *Id.*

The Conduit Bonds are neither a debt nor liability of the Commonwealth and do not involve the expenditure of any public funds. Va. Code § 15.2-4909. CSI will be solely responsible for repayment of the Conduit Bonds to investors and will pay any and all costs associated with their issuance. The IDA would issue the Conduit Bonds and loan the proceeds to CSI for the purpose of assisting CSI in the acquisition, construction, financing, and refinancing of certain projects of a capital nature within the scope of the Act. The IDA will have no active role after the Conduit Bonds are issued. The only benefit provided is that interest income for investors will not be subject to income taxation, pursuant to §§ 103 and 145 of the U. S. Internal Revenue Code and Va. Code § 15.2-4912.

*Discussion*

The Court must consider the separate requirements of: (I) the Act; (II) the United States Constitution; and (III) the Virginia Constitution.

I. *The Act.*

The scope of the challenge before the Court is not to the constitutionality of the Act but to the specific issuance of the Conduit Bonds to CSI. Since the IDA is defined under the Act as a body politic and corporate with such public and corporate powers as are delegated in the Act, "[s]uch powers are legislative powers and their exercise is a legislative function." *Industrial Dev. Auth. of Richmond v. LaFrance Cleaners and Laundry Corp.*, 216 Va. 277, 281 (1975). "A court must uphold a legislative action, if in the face of

evidence of unreasonableness … evidence of reasonableness is sufficient to make the question fairly debatable … ." *Id.* Thus, in reviewing the IDA's legislative action in deciding to issue the Conduit Bonds to CSI, the Court "must consider all competent evidence adduced at trial concerning facts and circumstances existing at the time the legislative action was taken; if evidence of such facts and circumstances is sufficient to make the reasonableness of the legislative action 'fairly debatable,' the court must uphold that action." *Id.* at 282.

It appearing that the proper statutory procedures were followed, the initial statutory questions are (1) whether CSI meets the Act's requirement that the "primary purpose" of a borrower institution is "education" and not "religious training or theological education," Va. Code § 15.2-4902; and (2) whether the facilities to be financed are "usual and customary to a[n] … elementary or secondary school campus other than chapels and their like." *Id.* As rehearsed above, the IDA's resolution authorizing the issuance of the Conduit Bonds explicitly "found and determined" both of these questions in the affirmative. In light of the testimony of the witnesses, school officers, the headmaster, and parents of students, as supported by binders of exhibits, including curricula plans, student/parent and faculty handbooks, representative academic texts, and detailed self-study, the Court finds the evidence clearly sufficient to make the reasonableness of the legislative action "fairly debatable." Additionally, the Court notes that CSI has been subject to independent scrutiny by the Virginia Association of Independent Schools ("VAIS") which requires that "[i]f a VAIS school is religiously affiliated, the academic and extra-curricular programs must be based primarily on an educational rationale" and that "[t]here is congruence between the stated mission of the school and the actual program of the school." Pl.'s Mem. Supp. Mot. J., Taggart Aff., Ex. 4 at 2 and Pl.'s Ex. 29. Having satisfied the statutory inquiry, the Court now turns to the constitutional analyses.

## II. *The United States Constitution*

As a political subdivision of the Commonwealth of Virginia, the IDA is subject to the constitutional limitations on government action imposed by the Establishment of Religion Clauses of the Virginia Constitution and the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution. *See Habel v. Industrial Devel. Auth. of the City of Lynchburg*, 241 Va. 96, 99 (1991). By the same token, the IDA is equally subject to First Amendment restrictions on infringing the right to free speech. Curtailment of free speech is permissible

only where a state action "serves a compelling state interest and … is narrowly drawn to achieve that end," *Widmar v. Vincent*, 454 U.S. 263, 270 (1981). The need to comply with the Federal Establishment Clause constitutes such an interest. *See id.*; *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761-62 (1995); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). Although the Establishment Clause jurisprudence of Virginia's Constitution could theoretically be stricter than the Federal standard, an infringement of First Amendment free speech rights would not be compelled by a state constitution because provisions of the Federal Constitution must prevail over conflicting requirements of state constitutions by virtue of the Supremacy Clause. *See*, U.S. Const., art. VI, cl. 2 ("This Constitution … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"). Hence, before taking up the Defendants' Establishment Clause claims, the Court must consider the Plaintiff's free speech claim.

A. *First Amendment Free Speech*

In *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 837 (1995), the U.S. Supreme Court held that the University of Virginia encroached upon the free speech rights of a student magazine, *Wide Awake*, when it paid an outside contractor to service the printing needs of student publications but refused to provide this benefit to *Wide Awake* "solely on the basis of its religious viewpoint." *Rosenberger* taught that subject to two clearly-defined exceptions, the First Amendment forbids government discrimination for or against private speech based on the content or viewpoint of the speech. *Id.* at 828. Unless enlisting private entities to convey its own message or to promote a particular government policy, *id.* at 833, even where government subsidizes, rather than penalizes, private speech, it cannot "favor some viewpoints or ideas at the expense of others." *Lamb's Chapel*, 508 U.S. at 394 (*quoting City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984)).

In *Columbia Union College v. Clark*, 159 F.3d 151, 156 (1998), *cert. denied*, 119 S. Ct. 2357 (1999), the U. S. Court of Appeals for the Fourth Circuit applied *Rosenberger* to find that Maryland's grants to private educational institutions under the Sellinger program "similarly infringed on Columbia Union's free speech rights by establishing a broad grant program to provide financial support for private colleges that meet basic eligibility criteria but denying funding to Columbia Union solely because of its alleged

pervasively partisan religious viewpoint." Importantly, the basic eligibility criteria of the Sellinger program included restrictions that "no Sellinger funds will be used for 'sectarian purposes' including 'religious instruction, religious worship, or other activities of a religious nature'." *Id.* at 154 (*quoting* Md. Code Ann., Educ. §§ 17-103, 17-107). Despite these statutory restrictions on religious purposes, "many colleges participating in the Sellinger program were affiliated with religious institutions and because Maryland deemed Columbia Union, a private liberal arts college affiliated with the Seventh-day Adventist Church, 'too religious' to participate," *Columbia Union*, 119 S. Ct. at 2357 (Thomas, J., dissenting), the Fourth Circuit in *Columbia Union* held that "*Rosenberger* controls the resolution of [Columbia Union's] free speech claim." 159 F.3d at 156. As in *Rosenberger*, there is no suggestion in the instant case that the General Assembly created the Act "to advance religion or adopted some ingenious device with the purpose of aiding a religious cause." *Rosenberger*, 515 U.S. at 840. Thus, this Court finds the Act in the instant case to be a "broad-reaching government program[] neutral in design," *id.* at 839, and that, as in *Columbia Union*, denial of the Conduit Bonds based on CSI's alleged pervasively religious viewpoint would infringe CSI's free speech rights under the First Amendment. Having reached this conclusion, "it remains to be considered whether the [free speech] violation following from the [requested denial of the bonds] is excused by the necessity of complying with the Constitution's prohibition against state establishment of religion." *Id.* at 837.

### B. *First Amendment Establishment Clause*

In *Agostini v. Felton*, 521 U.S. 203 (1997), the Supreme Court revisited a New York effort to send public school teachers into parochial schools to provide remedial education to disadvantaged children pursuant to a congressionally-mandated program. The New York effort had been declared unconstitutional in *Aguilar v. Fenton*, 473 U.S. 402, 414 (1985), for necessitating "excessive entanglement of church and state in the administration of benefits." The Court in *Agostini* agreed that "the landscape of Establishment Clause decisions has changed," 521 U.S. at 214, and therefore explicitly overruled *Aguilar* and part of a companion case, *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985) (invalidating a Michigan "Shared Time" program analogous to the Federal Title I program in New York because it had the impermissible effect of advancing religion, *id.* at 385).

The *Agostini* court evaluated "whether *Aguilar* has been eroded by our subsequent Establishment Clause cases," 521 U.S. at 218, by analyzing the

rationale upon which *Aguilar* and *Ball* rested. *See id.* The starting point in both cases was the three-pronged *"Lemon* test" set forth in *Lemon v. Kurzman*, 403 U.S. 602 (1971): "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive entanglement with religion." *Id.* at 612-13 (internal quotation marks and citations omitted). The *Agostini* Court reaffirmed the importance of the "purpose" prong, 521 U.S. at 222-23, and concluded that the "effect" and "entanglement" prongs "rightly compromise a single 'effect' inquiry." *Columbia Union*, 159 F.3d at 157 *(citing Agostini*, 521 U.S. [at 232-33]). In the instant case the "purpose" prong is not at issue, and this Court agrees that the Act has a secular legislative purpose. *See Hunt v. McNair*, 413 U.S. 734, 741 (1973) (noting reasons with regard to a similar Educational Facilities Act why "the purpose of the statute is manifestly a secular one"); *Habel*, 241 Va. 96 (assuming the same in interpreting the Virginia predecessor to the Act, relying on the reasoning in *Hunt).*

Turning then to the "effect" inquiry, the Court notes the necessity of close reading in this area in light of the *Agostini* holding that "[w]hat has changed since we decided *Ball* and *Aguilar* is our understanding of the criteria used to assess whether aid to religion has an impermissible effect." 521 U.S. at 223. *Agostini* "expressly rejected the general proposition, stated in *Ball* and *Aguilar* (and *Roemer [v. Board of Public Works of Md.*, 426 U.S. 736, 755 (1976) (plurality opinion)]), that 'all governmental aid that directly aids the educational function of religious schools is invalid'." *Columbia Union*, 159 F.3d at 160 *(quoting Agostini*, 521 U.S. at 225). Indeed, the Fourth Circuit declared that "government aid flowing to even a pervasively sectarian institution does not impermissibly advance religion" under certain conditions. *Id.* at 161. Chief Judge Wilkinson, agreeing with the majority's holdings in *Columbia Union* but dissenting from its decision to remand for further factual development, *see id.* at 168, n. 8, suggested that "[a]s a matter of prediction, Columbia Union may be right" that "because Maryland's Sellinger Program awards funding to private institutions of higher education under neutral criteria, without regard to the institution's sectarian or nonsectarian character, the provision of funds to Columbia Union cannot offend the Establishment Clause." *Id.* at 63 (Wilkinson, C.J., dissenting). Citing a rising emphasis on the Establishment Clause neutrality principal, *see Witters v. Washington Department of Services for the Blind*, 474 U.S. 481 (1986) (stressing that aid was "made available generally," *id.* at 487, in upholding provision of state funds for blind at a Bible college to become "a pastor, missionary, or youth director," *id.* at 483); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1

(1993) (approving provision of interpreter for deaf at a pervasively sectarian educational institution and noting: "We have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit," *id.* at 8); *Rosenberger*, 515 U.S. 819 ("A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion," *id.* at 839); *Agostini* (as discussed above), Chief Judge Wilkinson also noted "the emergent neutrality principle already has found its place in the Free Exercise Clause," *Columbia Union*, 159 F.3d at 172 (Wilkinson, C.J., dissenting) (*citing Employment Division v. Smith*, 494 U.S. 872 (1990)) and that "[t]he application of the neutrality principle under the Establishment Clause, therefore, would bring both of the religion clauses into step." *Id.* The Chief Judge concluded:

> To hold that Maryland must refuse Columbia Union funding while allowing it to extend aid to other religious institutions would violate the very principal of neutrality required by the Establishment Clause. *See Rosenberger*, 515 U.S. at 845-46; *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 707, 129 L. Ed. 2d 546, 114 S. Ct. 2481 (1994) ("It is clear that neutrality as among religions must be honored."). The denial of state aid to only certain types of religious institutions — namely, pervasively sectarian ones — exposes government to accusations of religious favoritism. Nowhere is this more evident than in the administration of Maryland's Sellinger Program: Colleges affiliated with the Roman Catholic Church have been approved while Columbia Union, a Seventh-day Adventist institution, has been rejected. For the sake of avoiding the mere potential that secular aid will somehow advance sectarian objectives, Maryland has directly violated a different core principle of the Establishment Clause, the principle of nondiscrimination among religions. Just as all private institutions should be treated neutrally, so should all religious viewpoints be treated similarly. Maryland's program now does neither of these things. Because the Sellinger Program violates the Supreme Court's recent neutrality principle in two respects, I would unhesitatingly find Columbia Union's pervasively sectarian character irrelevant and reverse the judgment of

the district court [finding violation of Establishment Clause under "pervasively sectarian" test.]

*Id.* at 172 (Wilkinson, C.J., dissenting). This Court would find similarly in the instant case under a "neutrality principle" test.

Despite this analysis, the *Columbia Union* court determined it was constrained by its finding that the Supreme Court had never explicitly overruled a trilogy of cases, *Hunt, Roemer,* and *Bowen v. Kendrick,* 487 U.S. 589 (1988), implicating various forms of "direct funding" of religious schools. Since it could not be said of the Sellinger grant program that "no [public] funds ever reach the coffers of religious schools," *Agostini,* 521 U.S. at 228, the Fourth Circuit had its hands tied: "the Court of Appeals should follow the case which directly controls, leaving to this [the Supreme] Court the prerogative of overruling its own decisions." *Id.* at 237 (*quoting Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989)).

The finding of the Fourth Circuit that it had its hands tied in *Columbia Union* prompted a vigorous dissent to the denial of certiorari by Justice Thomas ("perhaps because this case comes to us in an interlocutory posture") as follows:

> The "pervasively sectarian" test rests upon two assumptions that cannot be squared with our most recent jurisprudence. The first of these assumptions is that the Establishment Clause prohibits government funds from ever benefitting, either directly or indirectly, "religious" activities. The other is that any institution that takes religion seriously cannot be trusted to observe this prohibition. We no longer require institutions and organizations to renounce their religious missions as a condition of participating in public programs. Instead, we have held that they may benefit from public assistance that is made available based upon neutral, secular criteria. Furthermore, the application of the "pervasively sectarian" test in this and similar cases directly collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity. We should take this opportunity to scrap the "pervasively sectarian" test and reaffirm that the Constitution requires, at a minimum, *neutrality* not *hostility* toward religion.

*Columbia Union,* 119 S. Ct. at 2357-58 (emphasis in original) (citations and footnote omitted) (Thomas, J., dissenting).

In the instant case, while it is literally true that no public moneys reach the coffers of CSI and tax exemptions seem somehow different from a "direct money payment to sectarian institutions," *Rosenberger*, 515 U.S. at 842, the *Rosenberger* majority inexplicably carried forward the dissent's citation of *Hunt* among the cases referred to as involving direct funding. As *Hunt* appears most directly applicable to our facts, this Court finds itself in a similar posture as the Fourth Circuit in *Columbia Union*: bound by a test that seems not to square with recent Establishment Clause jurisprudence.

This seems particularly likely in light of the stress laid on direct cash payments by the Fourth Circuit in distinguishing *Columbia Union* from *Agostini*, *Rosenberger*, *Witters*, and *Zobrest*. *Hunt* itself leaves open the additional possibility that tax exemptions may well be permitted even to a purely sectarian institution (although such institutions are, of course, barred by the current Act) under *Walz v. Tax Comm'n*, 397 U.S. 664 (1970). The Court in *Hunt* declined to decide this issue but noted:

> The "state aid" involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available ... . Because we conclude that the primary effect of the assistance afforded here is neither to advance nor to inhibit religion under *Lemon* and *Tilton*, we need not decide whether ... the importance of the tax exemption in the South Carolina scheme brings the present case under *Walz v. Tax Comm'n*, 397 U.S. 664 (1970), where this Court upheld a local property tax exemption which included religious institutions.

*Hunt*, 413 U.S. at 745, n. 7.

In *Hunt*, the Court quoted the three-pronged *Lemon* test, established the secular purpose of the educational facilities statute, and then interpreted the "primary effect" prong by stating: "Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an

otherwise substantially secular setting." *Hunt*, 413 U.S. at 743. Over the objections of a vigorous dissent (which noted that "[n]o one denies that the Baptist College at Charleston is a 'sectarian' institution — i.e., one in which the propagation and advancement of a particular religion are a function or purpose of the institution," *id.* at 750, n. 1 (Brennan, J., with Douglas, Marshall, JJ., dissenting)), the Court in *Hunt* upheld the financing, citing factors mentioned in *Tilton v. Richardson*, 403 U.S. 672 (1971) (upholding direct federal grant to four colleges and universities in Connecticut since, despite institutional rhetoric, none was pervasively sectarian). As summarized by *Columbia Union*, 159 F.3d at 163, guideline inquiries into a "pervasively sectarian" college include:

> (1) does the college mandate religious worship, (2) to what extent do religious influences dominate the academic curriculum, (3) how much do religious preferences shape the college's faculty hiring and student admission process, and (4) to what degree does the college enjoy "institutional autonomy" apart from the church with which it is affiliated.

The Court has never discussed the relative importance of these factors. Clearly, though, no one of them in isolation is dispositive. For example, although "Catholic religious organizations ... governed" all the colleges in *Tilton*, their lack of institutional autonomy simply constituted one factor in favor of finding them pervasively sectarian. *Tilton*, U.S. at 686-87. Similarly, the colleges at issue in *Roemer* required students to take certain religion courses, but this fact alone did not render them pervasively sectarian. *Roemer*, 426 U.S. at 756.

A careful reading of *Roemer*, *Tilton*, and *Hunt* leads to the inescapable conclusion that even colleges obviously and firmly devoted to the ideals and teachings of a given religion are not necessarily "so permeated by religion that the secular side cannot be separated from the sectarian." *Roemer*, 426 U.S. at 759 (*quoting Roemer v. Board of Pub. Works of Md.*, 387 F. Supp. 1282, 1293 (D. Md. 1975)). Indeed, the Supreme Court has set the bar to finding an institution of higher learning pervasively sectarian quite high. We believe that to find religion pervades a college to such a degree that religious indoctrination thoroughly dominates secular instruction, the college must in fact possess a great many of the following characteristic: mandatory student worship services; an express preference in hiring and admissions for members of the affiliated church for the purpose of deepening the religious experience or

furthering religious indoctrination; academic courses implemented with the primary goal of religious indoctrination; and church dominance over college affairs as illustrated by its control over the board of trustees and financial expenditures.

*Columbia Union*, 159 F.3d at 163.

Although the instant case involves an institution of elementary and secondary education rather than of higher education (the United States Supreme Court has never found any institution of higher education to be pervasively religious, *see id.* at 151), this Court must assume similar factors to be relevant and conduct its analysis with due concern for the greater sensitivity the Supreme Court has shown for the susceptibility of children. *See e.g., Lemon*, 403 U.S. 602. Considered in that light, the Court nevertheless finds that in the context of CSI's clear (and successful) educational mission, the religious features stressed by the Defendants constitute factors which, in total, do not render CSI pervasively sectarian. The required brief weekly chapel, for example, is one factor but, especially as practiced, is insufficient by itself to decide the issue. Consideration of religion in faculty and administration hiring is another factor but one that must be taken in context with other criteria employed and which additionally should be tempered by the explicit prohibition on proselytizing students. Mandatory Bible courses are again one factor, but as note in *Columbia Union*, "mandatory religion courses do not necessarily constitute evidence that a college is 'pervasively sectarian' because they may only supplement a curriculum covering 'the entire spectrum of a liberal arts program'." 150 F.3d at 165 (*quoting Roemer*), 426 U.S. at 757) (internal quotation marks omitted). Despite introductory language in the Self-Study, the above statement appears to describe well the educational program of CSI. Indeed, in light of the Fourth Circuit's emphasis on evidence of how these courses were actually taught, *see id.*, this Court finds the Self-Study to demonstrate appropriate academic freedom and not religious indoctrination. *See* Pl.'s Ex. 27. Thus, recognizing such "difficult constitutional questions [are] dependent on intensely factual determination," *id.* at 168, this Court finds the evidence does not rise to the level of proving CSI to be "pervasively sectarian" but rather tends to show, as implicitly approved in *Columbia Union*, that CSI "predominantly exposes its students to a wide variety of academic disciplines, including religious teachings." *Id.* at 165.

As a final consideration, the Defendants urge the Court that "[e]ven if the school is not pervasively religious, however, the bonds are unconstitutional because the financed facilities will be used for religious instruction and

mandatory worship services." Def.'s Mem. Opp'n at 12-13. Defendants' argument cites *Tilton v. Richardson*, 403 U.S. 672 (1971) (striking provision under which the church-related colleges would have unrestricted use of a federally financed project after 20 years reasoning: "If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion." *id*. at 683); and *Committee for Public Educ. v. Nyquist*, 413 U.S. 756 (1973) (striking down grants for maintenance and repair of religious school facilities without any limitations on their use). Although the majority in *Hunt* indicated that that financing would be subject to state law "prohibitions against use for religious purposes," 413 U.S. at 744, it upheld the financing subject to those restrictions, despite the objection of the dissent which cited both *Tilton* and *Nyquist*. In the instant case, the Court has determined in Part I above that the evidence is sufficient to uphold the IDA's finding that the Conduit Bonds meet the statutory requirement of the Act that the "facilities" to be financed are "usual and customary to a[n] ... elementary or secondary school campus other than chapels and their like." This Court therefore follows *Hunt* in reasoning that "[i]n the absence of evidence to the contrary, we must assume that all of the proposed financing ... relates to buildings and facilities within a properly delimited project" under state law. *Hunt*, 413 U.S. at 744.

### III. *The Virginia Constitution*

Having concluded in Part II above that curtailment of CSI's free speech rights will only be compelled by the First Amendment Establishment Clause and not by the Virginia Constitution, it may yet be wise to demonstrate that no Establishment Clause violation would result even were the Establishment Clause of Virginia's Constitution deemed more restrictive than the Establishment Clause of the First Amendment. In *Habel*, 241 Va. 96, the Virginia Supreme Court reversed on Virginia Establishment Clause grounds the trial court's validation of Educational Facilities Revenue Bonds issued by the Industrial Development Authority of the City of Lynchburg to Liberty University. Free speech rights were not raised in that case, and in announcing its test for determining the constitutionality of that matter, the Court noted:

Article I, § 16, of the Constitution of Virginia provides in pertinent part that "[T]he General Assembly of Virginia shall not ... confer any peculiar privileges or advantages on any sect or denomination." We have not had occasion to construe this article in the context of the

issues raised in this case. However, we find the Supreme Court's construction of the Establishment of Religion Clause of the First Amendment, "Congress shall make no law respecting an establishment of religion," helpful and persuasive in this case in construing the analogous state constitutional principles.

*Id.* at 100.

The Court in *Habel* first adopted the three-pronged *Lemon* test and then focused its inquiry only on the "effect" prong, asking "whether the bond issue would have the 'principal or primary effect' of advancing religion." *Id.* The test it used in interpreting "principal or primary effect" was drawn from *Hunt*, 413 U.S. at 743: "Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." It then proceeded to find, on a strong set of facts set forth in an appendix, that Liberty's "pervasive aim [of] equipping of young people for evangelistic ministry in the local church" makes Liberty "an institution in which religion is so pervasive" that "the proposed bond issue would violate the Establishment of Religion Clauses of the United States and Virginia Constitutions." *Habel*, 241 Va. at 100.

In light of the recent changes in the Establishment Clause jurisprudence of the United States Supreme Court described in Part II(B) above, the fact that the Virginia Supreme Court looked to the U. S. Supreme Court for guidance in *Habel* presents some question of whether the Virginia Supreme Court would consider the standard set forth in *Habel* to be good Virginia constitutional law in this context today. Nevertheless, to the degree that the *Habel* test may differ from the "pervasively sectarian" test considered above, this Court finds the policies, character, and activities of CSI readily distinguishable on the facts from those attributed to Liberty. *See id.* (e.g., "Liberty's published policies required its faculty and students to attend church and chapel six times each week, its faculty and students were required to subscribe to Liberty's doctrine, and its faculty's academic freedom was circumscribed by Liberty's doctrinal statements"). Thus, especially given the lack of any evidence of a "pervasive aim" of equipping young people for evangelistic ministry, this court does not find CSI to be "an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in [its] religious mission." *Id.* (*quoting Hunt*, 413 U.S. at 743).

*Conclusion*

For the reasons set forth above, the Court finds no violation of the Act or of the Establishment Clauses of the United States and Virginia Constitutions. CSI does not have the "primary purpose" of providing religious training or theological education; it is not "pervasively sectarian"; nor is religion at CSI "so pervasive that a substantial portion of its functions are subsumed in [its] religious mission." The Conduit Bonds will not finance "chapels or their like." Lacking a compelling government interest, it would be impermissible viewpoint discrimination to deny validation of Conduit Bonds to CSI under a broad neutral government program in which other church-affiliated institutions have taken part, solely on the basis of its religious viewpoint.